# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
        Plaintiff,

v.                                                  Case No. 05-C-1063

BRINKER INTERNATIONAL PAYROLL
COMPANY, L.P., d/b/a Chili's Grill & Bar,

        Defendant.

## DECISION AND ORDER

The Equal Employment Opportunity Commission ("EEOC") brings this class action alleging that the defendant Brinker International Payroll Company ("Brinker"), which operated a Chili's Grill & Bar in Pleasant Prairie, Wisconsin ("Chili's/PP"), discriminated against Angel Quintero ("Quintero") and Hispanics as a class by denying them server positions in the restaurant. While the action is styled as a class action, EEOC is only pursuing claims on behalf of Quintero. Brinker moved for summary judgment.

Also pending is EEOC's motion for leave to file an amended complaint. EEOC requests leave to add ERJ Dining II, LLC ("ERJ"), which purchased Chili's/PP from Brinker, as a defendant for purposes of imposing injunctive relief.

For the reasons that follow, Brinker's motion for summary judgment is granted, EEOC's motion to amend the complaint is denied, and this matter is dismissed in its entirety.

# BACKGROUND

## I.    *Company Structure*

Brinker owns several restaurant brand franchises, including Chili's Grill & Bar. Brinker provides restaurants with guidance regarding how to operate the restaurant, but in general each restaurant is able to operate under its own criteria as determined by the restaurant's management team and the particular circumstances at the restaurant. Each restaurant has a budget which is established prior to each monthly period. The restaurant's General Manager then decides how much money can be spent on training in order to meet the budget.

Michael Guelzow ("Guelzow") was the restaurant's General Manager through June 2004. After June 2004, Matt Barbknecht ("Barbknecht") became the General Manager. Hiring and interview practices were substantially the same under Guelzow and Barbknecht.

Each restaurant is run by a General Manager, who reports to an Area Director. Each restaurant also has Managers, who report to the General Manager.

Managers have the same general responsibilities and are responsible for all areas of the restaurant, but are assigned to certain schedules. Each Manager normally attends a twelve-week training program and receives training on interviewing, hiring, equal employment opportunity, and diversity and is told that hiring should not be based on, among other things, national origin.

Hourly employees are divided into back of the house and front of the house positions and report to Managers and the General Manager. Front of the house positions consist of servers, bartenders, busboys (who are on the back of the house schedule), hostesses, to-go (where the individual handles customers picking up orders) and expo (where the individual assists in getting food from the kitchen to the dining area).

Back of the house positions consist of those individuals working in the kitchen, including dishwashers, janitorial, cooks, and prep (where the individual assists in getting ingredients ready for dishes).

## II. *Chili's/PP*

The Pleasant Prairie Chili's ("Chili's/PP") opened in February 2003. At that time, the Managers were Kevin Groth ("Groth"), Julia Miller ("Miller"), Ken Peters ("Peters"), Michael Barlow ("Barlow"), Holly Forrest ("Forrest") and Michael Guelzow ("Guelzow") (Managing Partner, a/k/a the General Manager).

After the restaurant opened, Miller was initially responsible for the bar, and then became responsible for training. Forrest was responsible for the servers and later became responsible for training. Barlow and Peters were responsible for the back of the house, and Groth floated where he was needed in the restaurant. After Forrest left the restaurant in September 2003, Barlow became responsible for the servers and Peters had sole responsibility for the kitchen.

All of the Managers participate in hiring. When hiring, the restaurant generally tries to plan ahead and, in particular for the winter holidays (the busiest time of the year), looks for employees who can be trained before the holidays and are ready to perform work during the holidays.[1] Depending upon restaurant needs, there may be occasions where the restaurant is hiring in the kitchen, but not hiring servers and vice versa. The need to hire for certain positions can also rapidly change when no need to hire for a position one day turns into a need to hire the

---

[1] EEOC disputes this finding of fact and claims that because turnover at the restaurant is 120%, Brinker is "constantly" hiring new employees. (Plaintiff's Response ("PR") to Defendant's Proposed Findings of Fact ("DPFF"), Docket No. 75, ¶ 22). EEOC's assertion is speculative and conclusory and does not contradict the proposed finding of fact. Accordingly, Brinker's proposed finding will be adopted by the Court. Moreover, EEOC repeatedly makes the same assertion in response to many of Brinker's proposed findings of fact. The Court will not pause to discuss each particular instance. Suffice it to say, the same logic applies.

next day. In particular, turnover in the restaurant industry is high, often exceeding 100% per year.

Managers would talk with each other about hiring, including the need to hire for a specific position, how many individuals, and when. Normally, the hiring process consists of an applicant coming in, talking to the host and asking for an application. When an applicant came in, the host usually calls back to a Manager and informs the Manager that there is a potential applicant who needs an application and the Manager takes the application up to the front desk. At the time the applicant completes an application, he or she typically speaks with an available Manager. However, that does not always happen and sometimes a Manager will get a number of applications from a host after the shift. If a Manager does get an application without being able to speak with the applicant, the Manager normally reviews it, but does not necessarily call the applicant back unless, for instance, the applicant had previously worked at Chili's or had availability fitting the restaurant's needs.

During a first interview, the applicant and Manager review the application, discuss what position the applicant is interested in and determine if the person might be able to fill a need of the restaurant. The restaurant determines an applicant's potential position based upon what the application states the applicant is interested in or by asking the applicant what position they are interested in. If the applicant is interested in one position more than another, the Manager steers the interview towards that position, but also considers the restaurant's needs. Managers also speak with applicants about their qualifications and then ask if the applicant is interested in a certain position based on the information provided by the applicant.

If the Manager is interested in hiring the applicant, a second interview is arranged with another Manager. After the second interview, an offer may be made. Guelzow's approval was generally required for hiring, although there were times where individuals were hired without obtaining that approval. If an individual is not hired, their application is put in a file.

There is no formal policy on going back to this file to review applications if a position opens. Some Managers look in the application file for applications from the past few days or weeks, but others do not. Guelzow believed that reviewing previously submitted applications was a waste of time because of the high turnover rates in the restaurant industry.

In determining whether to hire an individual, Managers would look at a number of things including the applicant's hygiene, availability, attitude, personality, communication skills and articulateness, ability to multi-task, friendliness, intelligence, experience, attentiveness, dependability, energy levels, and people skills based on information learned during the interview and from references. The managers would also look at the restaurant's staffing levels and needs, and other criteria listed on the interview forms. Servers need to be age 18 to meet the legal requirements for serving alcohol. There is also a minimum age limit of 17 for all positions based on work permit issues.

At times, the restaurant will train an employee for a job other than the one for which the employee was originally hired. This is known in the restaurant as "cross-training." The restaurant has no formal policy on when cross-training is provided, but factors in deciding whether to cross-train an individual include availability, the restaurant's needs (which would include its financial performance and timing of requests) and staffing levels, the individual's

length of time and performance in current position, if someone could fill the employee's original position, and the employee's qualifications for the job at issue.[2]

In general, training costs money because you must pay two people to do a single job, i.e., one person must show the other how the job is performed and then observe the new individual to make sure that it is performed correctly. Training a current employee for a new position usually takes the same amount of time as training a new hire for the position. In making cross-training decisions, the restaurant needs to balance profitability with quality and people. As a result, Guelzow's approval was required for cross-training. In addition, the restaurant normally does not cross train a new employee. Instead, an employee needs to prove they have a good work ethic, and are dependable and proficient in the skills they are currently learning, before the restaurant will expend more money on training them. In addition, the restaurant usually wants to get the benefit of the money spent on training the employee for the original position before it starts training on a new position.

Whether the restaurant will cross train or hire from the outside depends on a number of factors, including the time of year and budget. It is not unusual for delays to occur between requests for training and the actual training.

### III.  *Angel Quintero*

Angel Quintero ("Quintero") is Hispanic. Since 1999, Quintero has worked full-time at the North Shore Sanitary District in Waukegan, Illinois, first as a laborer and currently as an operator trainee. Because he has a family, he supplements his income by working part-time.

---

[2] Plaintiff disputes this fact by asserting that Brinker considered national origin in deciding whether to cross-train its employees. This conclusory allegation, which relies solely on Quintero's deposition testimony, represents exactly what the EEOC must demonstrate to defeat this motion for summary judgment and, standing alone, is simply not sufficient.

Before working at Chili's/PP, Quintero was a part-time server at an Applebee's restaurant, and he cooked at Paragon Restaurant, Taste of Wisconsin, McCormick's Lake Bluff, and at a Denny's Restaurant.

Quintero first applied for work as a server at Chili's/PP around June 2, 2003. Because of his full-time job at the Sanitary District, Quintero only had availability during the week at night. However, Quintero asserts that he was also available during weekend lunch and dinner shifts. (Plaintiff's Response "PR" to Defendant's Proposed Findings of Fact "DPFF" ¶ 80). At the time Quintero applied in June, he claims that he spoke with Mr. Guelzow, who told him that he would get back to him but never did. Quintero did not complain to anybody at that time about not being hired and does not know if anybody was hired instead of him. Only two individuals began working at Chili's/PP as servers in June 2003, both of whom applied before Quintero. Both of these individuals were white and worked the afternoon shift. One of them had no prior server experience.

Quintero next applied at Chili's/PP on September 6, 2003, seeking work as a cook. Quintero's application stated only that he was interested in the cook position, but when he handed in the application he indicated that he was also interested in the server position. He preferred to work as a server because, based on his experience as both a cook and a server, he knew he could make more money as a server. On his application, Quintero indicated that he was only available to work evenings and weekends. Quintero was given a Spanish-language application even though he did not request one.

Quintero had his first interview with Julia Miller on September 6, 2003. Quintero told Miller he was also interested in a server position. Miller explained that only a cook was needed

at that time, a conclusion the Managers had just made at a meeting. Following his first interview, Quintero came back for a second interview with Mike Barlow on either September 14 or 19. Quintero was hired for the cook position and began working on September 21, 2003. Quintero told Miller that he would accept the cook job but still wanted to become a server.

During orientation, Quintero watched videos and completed paperwork which included an Equal Employment Opportunity policy and Discrimination and/or Harassment policy. Quintero received a handbook, which contains a complaint procedure, and understood that Brinker had a Human Resources Department.

After Quintero was hired, he performed the salad/nacho cook position in which he cooked and prepared the salad dishes and assisted in cleaning the kitchen at the end of the shift and worked three or four shifts per week. Quintero normally worked second shift from approximately 4 to 11 and was the only person who worked the salad/nacho position during his shift.

Quintero quickly established a reputation as a good, hard-working employee. He was considered a "Chili Head," meaning an employee who showed teamwork, the ability to take feedback, energy, attitude, experience, and all of the loyalty and dedication that anyone would look for in an employee who is trying to be successful in business.

According to Quintero, he spoke with the Managers about becoming a server after he began working. During these conversations, nobody ever told Quintero how long it would take for him to become a server and nobody guaranteed Quintero a server position. Chili's/PP managers admit that, to minimize turnover, it is wise to retain good employees by trying to assist one who wishes to transfer to a different job within the restaurant. Permission to cross-train for a job was determined by the employee expressing a desire for cross-training, the restaurant's

needs, and financial considerations. General Manager Guelzow had final authority to decide who would be allowed to train at a different job.

In particular, Quintero first asked Peters, one of the managers, about becoming a server a week after he started working and then every time he saw him. Peters would tell Quintero that he could become a server as soon as something became available. When individuals were hired for the server position, Quintero would question Peters about it but was told that they had been hired prior to Quintero asking about becoming a server. Peters also explained that it was a problem for him to move into the server position because the restaurant did not have anyone to cook and also told Quintero that good kitchen help was hard to find. In addition, Quintero was also told that he needed to become certified in the salad nacho position before he could become a server. Quintero became certified sometime during the week of November 10. Peters supported Quintero cross-training for the server position, but wanted to make sure the kitchen was covered before doing so.

Quintero also spoke with Barlow about the server position and Barlow told Quintero that he could get a position whenever something became available. When Quintero asked Barlow why other people had been hired, Barlow explained that these individuals had applied first. On the second occasion when someone was hired for a server position after Quintero had been hired, Barlow explained that he had nothing to do with the decision.

Quintero also had several conversations with Julia Miller about becoming a server and Miller told Quintero that he needed to speak with Mike Guelzow. In the first conversation with Guelzow, Quintero asked if it was a possibility for him to become a server and Guelzow explained that because he had just trained as a cook, the restaurant needed him to hold down the

cook's position until after the first of the year, but that the restaurant would see what it could to about training him in the future. In the second conversation, Quintero told Guelzow that he had spoken to everybody about becoming a server and that he saw other people being hired as a server and was not being given the chance to do so. Guelzow told Quintero that they would see about his becoming a server and that at that time the restaurant was not hiring servers until after the first of the year.

Quintero's next conversation with Guelzow about the server position was in mid-December, about a month before he quit. At that time, Guelzow spoke with Miller about the training schedule and Quintero and Guelzow were working with Peters to try to figure out the days that he would be available as a server. Nobody told Quintero that he would not be moved into a server position. When Quintero had a conversation with Barlow about training materials not being ready, Barlow explicitly told Quintero that the restaurant intended to train him. Other Managers also supported cross-training Quintero.

Quintero worked at the restaurant through January 11, 2004. When Quintero got to work that day, he expected to train for the server position based on a conversation he had with Kevin Groth. However, Miller told him that Guelzow had changed his mind about training Quintero for the server position. After speaking with Miller, Quintero spoke with Guelzow. Guelzow told Quintero at that time that he would be trained for the server position either at the end of January or the next month. Guelzow told Quintero that his plan was to train four people in the month of January and that two people would be training at the beginning of the month and two at the end of the month and he wanted Quintero to train at the end of the month.

Quintero became upset and decided to quit. Quintero told Guelzow that he was quitting, put his apron away, punched out in the middle of his shift and left.

Quintero never complained to anyone at the corporate office or Human Resources about his not being placed in the server position. Quintero is not aware of anyone who was transferred from a cook to a server position while he was employed at the restaurant. The restaurant would not have cross-trained Quintero immediately after he was hired, but instead would have waited to see if he was a good employee. The restaurant generally does not train individuals during the busy holiday season or move them to different positions, although there were exceptions on occasion.

Moreover, in late November 2003, after mentioning the restaurant's poor financial performance, Guelzow informed the Managers that no one should be hired or cross-trained without letting him know. While sales improved in December, Guelzow anticipated, based on historic sales, that January was going to be a tough month. Because cross-training costs money, the restaurant tries to avoid it when the financial situation is poor. Thus, Guelzow was concerned about cross-training in December and January.

Such delays in training are not unusual. For instance, after Quintero left, Tom Christy, who is white, requested to transfer from a cook position to the front of the house. Christy requested to work in the front of the house several months before that request was eventually granted. Similarly, before Quintero worked at the restaurant, Lisa Maxey wanted to train as a server and also waited several months to do so.

On April 10, 2004, Quintero filed a Charge of discrimination with the EEOC. After conciliation failed, EEOC filed the instant lawsuit on October 5, 2005. EEOC sought to identify

as class members Hispanics who had been denied server positions, but was unable to locate potential class members. On November 14, 2006, EEOC advised Brinker's that it was no longer seeking monetary relief for anyone other than Quintero. As a result, EEOC is not seeking monetary relief for class members.

**IV.** *Employee List*

The only information provided by Brinker during the EEOC's investigation regarding employee ethnicity was a list generated through its People Soft system. During the new hire process, a Manager from the restaurant will be required to input into Brinker's computer system information regarding the employee. Among the information requested is the employee's ethnicity. The majority of the Managers directly ask an employee's ethnicity when completing new hire paperwork, but some Managers do not ask for this information. In addition, errors can occur by Managers inputting information incorrectly or guessing or defaulting back to the first screen prompt, which indicates ethnicity is White. Moreover, some employees decline to answer the question. Accordingly, many of the Managers noted errors on this list regarding employees' ethnicities. Brinker did hire servers who were Hispanic, even though they were not identified on this list as Hispanic, including Tracy Davis and Yvonne Fritz.

**DISCUSSION**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**I.**     *Discrimination Claims*

With regard to claims brought on behalf of Quintero, the EEOC proceeds on the following theories: (1) Brinker (Chili's/PP) discriminated against Quintero on account of his national origin by failing to hire him when he initially applied for work in June 2003; (2) Brinker discriminated against him by hiring him as a cook instead of a server in September 2003; (3) Brinker discriminated against him when it failed to cross-train him for a server position; and (4) Brinker constructively discharged Quintero by failing to cross-train him for a server position.

EEOC has no direct evidence of discrimination, so it must proceed under the familiar indirect burden-shifting method. In the failure to hire context, the EEOC must meet all of the following elements: (1) plaintiff is a member of a protected class; (2) plaintiff applied for and was qualified for an open position; (3) plaintiff was rejected for the position; and (4) defendant granted the job to someone outside the protected class who was similarly situated. *See Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003); *Sembos v. Philips Components*, 376 F.3d 696, 700 (7th Cir. 2004).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. To meet this burden, the defendant must present "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for its decision." *EEOC v. Our Lady of Resurrection Medical Ctr.*, 77 F.3d 145, 149 (7th Cir. 1996) (internal quotations omitted).

If the defendant meets this burden, the plaintiff must demonstrate that the proffered justification is merely a pretext for discrimination. Plaintiff can do so by "(1) showing that a discriminatory reason more likely than not motivated the employer . . .; or (2) that the employer's proffered explanation is unworthy of credence." *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir.), *cert. denied*, 513 U.S. 948 (1994).

EEOC argues that two Caucasian individuals – Brian Caldwell and Elizabeth Sevick – were hired as servers in June 2003. (DPFF, ¶ 82). However, these individuals are not similarly situated to Quintero because they were able to and did work the weekday lunch shift, which Quintero was unable to work. (Guelzow Aff., ¶ 10; DPFF, ¶ 85). *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (Employees are similarly situated if they are "directly comparable in all material respects"); *Clark v. Johans*, 460 F.3d 1064, 1068 (8th Cir. 2006) (comparator not similarly situated due to plaintiff's year-round restriction on availability for work).

EEOC argues that it need not provide any similarly situated comparators as part of its *prima facie* burden in the context of a failure-to-hire claim. However, the need for lunch/day servers, as opposed to night servers, demonstrates that Quintero was not qualified for the job opening in any event. It also serves as a legitimate, non-discriminatory justification for Brinker's failure to hire Quintero in June. (Guelzow Aff., ¶ 10; PFOF, ¶ 86).

When Quintero renewed his application in September 2003, he explicitly applied for the cook position, while peripherally mentioning his desire also to become a server. Therefore, it is difficult to discern how the EEOC can justify its position that the decision to hire Quintero as a cook resulted in an adverse employment action. Furthermore, there wasn't an opening as a

server when Quintero sought employment in September. The fact that Chili's/PP, and the restaurant business in general, experiences a high rate of turnover, or that Chili's/PP was always generally "accepting" applications, does not mean that there was always an available opening for every possible position.

Chili's/PP's failure to cross-train Quintero as a server also fails at the *prima facie* stage. As the undisputed facts demonstrate, the decision to cross-train depended upon a number of factors, none of which were related in any way to Quintero's national origin. Given the ever-changing economic and business conditions at the restaurant, it is not surprising or suspicious that the specific time-frame kept getting delayed. Quite simply, there wasn't an opening that met Quintero's availability. Moreover, EEOC provides no similarly situated comparators – an individual who was hired as a cook, needed to prove he was a good employee to justify the expense of cross-training, and then was actually cross-trained during the busy holiday season or soon thereafter.

The EEOC's constructive discharge claim is similarly defective. The EEOC must "not only demonstrate that a hostile work environment existed, but also that the abusive working environment was so intolerable that [Quintero's] resignation was an appropriate response." *Pennsylvania v. Suders*, 542 U.S. 129, 147 (2004). In other words, the working conditions must be "even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 1994).

It is difficult to imagine how Quintero's situation even remotely resembles a constructive discharge scenario. While his subjective reaction to the delay in his training is understandable

on some level, suddenly quitting after being told that his training was delayed for a few weeks or even a month is not a reasonable reaction. *See, e.g., Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir. 1996) (rejecting constructive discharge claim as a matter of law where plaintiff, among other things, was required to train younger employees, his request for a transfer was denied, and he was told that if he did not like the denial of his transfer request, he could quit); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001) (failure to promote, combined with defendant allegedly giving plaintiff stock work, accusing plaintiff of stealing, giving sales leads to others and monitoring of plaintiff did not establish intolerable working conditions); *Alfieri v. Sysco Food Serv.*, 192 F. Supp. 2d 14, 23 (W.D.N.Y. 2001) (finding that a constructive discharge cannot be established through evidence that an employee was dissatisfied with the nature of her assignments or working conditions were difficult).

Moreover, there is absolutely no evidence to suggest that the failure to train Quintero was in any way related to his national origin. *See McPherson*, 379 F.3d at 440 (employee can be constructively discharged "only if the underlying working conditions were themselves unlawful or discriminatory in some fashion"). EEOC's constructive discharge claim fails as a matter of law.

**II.** *Pretext*

The EEOC asserts that Brinker hired Hispanics for its "back-of-the-house" positions (mainly the kitchen), and non-Hispanics for its server positions in the "front-of-the-house." The EEOC relies upon Deposition Exhibit 7, a list of employees provided by Brinker which indicates the employee ethnicities at Chili's/PP. Even assuming that the list is accurate in all respects – and Brinker's vigorously disputes its accuracy – this evidence, standing alone, is simply not

probative of discrimination. The proper comparison is "between the . . . composition of the [employees working in the positions at issue] and the composition of the qualified . . . population in the relevant labor market." *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977). EEOC fails to provide any such comparison.

In the proper context, statistics can be relevant evidence of discrimination. Absent the proper context, the EEOC is relying solely upon correlation, and "[c]orrelation is not causation." *Tagatz v. Marquette University*, 861 F.2d 1040, 1044 (7th Cir. 1988). "[Plaintiff's] failure to control for differences in rank, like the failure to control for differences in scholarly productivity and teaching evaluations, made his table essentially worthless – and such variables *can* be controlled for." *Id.* at 1045 (emphasis in original). In other words, statistical evidence is "only helpful when the plaintiff faithfully compares one apple to another without being clouded by thoughts of Apple Pie ala Mode or Apple iPods." *Hemsworth v. Quotesmith.com, Inc.*, — F.3d —, No. 06-1885, 2007 WL 416984, at 7 (7th Cir. February 8, 2007). Accordingly, even if the EEOC could establish a *prima facie* case, the foregoing statistical evidence is not probative of discrimination and fails to rebut Brinker's legitimate, non-discriminatory justifications for its actions.

### III. *Motion to Amend the Complaint*

EEOC also moves to amend the complaint to add ERJ Dining, which purchased the Chili's/PP from Brinker in August 2003, as a defendant for purposes of seeking injunctive relief. There is no allegation in the proposed amended complaint that ERJ is or will continue Brinker's alleged discriminatory practices. And obviously, the Court has concluded that Brinker did not engage in any discriminatory practices as a matter of law. Accordingly, amending the complaint

would be futile. *See Foman v. Davis*, 371 U.S. 178, 181-82 (1962) (Courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. EEOC's motion for leave to file an amended complaint [Docket No. 59] is **DENIED**;

2. Brinker's motion for summary judgment [Docket No. 64] is **GRANTED**; and

3. This matter is **DISMISSED** in its entirety. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of March, 2007.

**BY THE COURT:**

s/Rudolph T. Randa
**HON. RUDOLPH T. RANDA**
**Chief Judge**